UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ASHLEY DAVIS,

    Plaintiff,

v.

UNKNOWN BOUCK, et al.,

    Defendants.
_____/

Case No. 1:20-cv-412

Hon. Hala Y. Jarbou

## OPINION

This is a civil rights action asserting claims under 42 U.S.C. § 1983 and state law. Before the Court is Defendants' motion to dismiss for failure to state a claim (ECF No. 14). For the reasons herein, the Court will deny the motion.

### I. Background

Plaintiff Ashley Davis asserts claims arising from a visit with her fiancé, Deandra Choice, who was incarcerated at the Michigan Reformatory (RMI) in Ionia, Michigan. Defendants Bouck and Turnley are officers employed by the Michigan Department of Corrections at RMI.

According to Plaintiff's complaint, the visit occurred on December 2, 2019. Davis arrived at RMI at 2:30 pm. She was taken to the visitation room at 4:00 pm. She took a restroom break at about 5:30 pm, leaving the visitation room and returning in a "timely fashion." (Compl. ¶ 10, ECF No. 1.)

At about 6:30 or 6:45 pm, she told Officer Bouck that she was ready to end her visit and that she needed to use the restroom "immediately." (*Id.* ¶ 11.) Bouck allegedly told Davis that he would let Officer Turnley know that she was ready to end her visit. Ten minutes later, Davis's

fiancé again told Bouck that Davis needed to use the restroom urgently. Bouck called the front desk to ask Turnley to come release Plaintiff.

Davis and her fiancé moved their seats closer to the exit so that she could leave as soon as possible. Time passed and Turnley did not arrive. Davis began to pace around the room due to her urge to urinate. Bouck apparently called the front desk again, requesting that an officer come release Davis.

Davis could barely wait any longer, so she grabbed a stack of napkins from the microwave area and moved to the "bottom level" of the waiting room area by the exit door. (*Id.* ¶ 17.) Davis begged Bouck to release her or to stop a passing correctional officer to let her out. He told her that he could not do that. A few minutes later, at about 7:15 or 7:30 pm, Bouck came down to the lower level and rang a bell by the door. He let Davis into the hall and told another officer that Davis needed to use the restroom. The two officers allegedly "spent a few more minutes talking and not opening the gate to release Plaintiff." (*Id.* ¶ 20.) Plaintiff could not hold it any longer, and she felt herself begin to urinate. She shoved the stack of napkins into her underwear while standing in the hall and urinated on herself. As this was happening, Officer Turnley came around the corner and smirked at Davis.

After the officers finally opened the gate, Davis rushed to the restroom and finished urinating. Turnley allegedly went into the visitation room and announced to Davis's fiancé that Davis had "just pissed on herself." (*Id.* ¶ 25.) After Davis left the restroom, she went to the front desk to retrieve her identification where she saw Turnley "laughing and joking about the situation." (*Id.* ¶ 26.)

Based on the foregoing, Davis contends that Defendants "wantonly, willfully, and maliciously" refused to address her needs. (*Id.* ¶ 31.) Davis claims that Defendants deprived her

of substantive due process, in violation of the Fourteenth Amendment, by denying her access to the restroom to urinate in privacy. In addition, she claims that Defendants falsely imprisoned her and intentionally inflicted emotional distress on her, in violation of state law.

Defendants argue that they are entitled to qualified immunity because they did not violate Davis's constitutional rights, let alone rights that are clearly established. Defendants further argue that, if the Court dismisses Davis's constitutional claim, the Court should decline to exercise supplemental jurisdiction over her state law claims.

## II. Dismissal Standard

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Id.* (quoting Fed. R. Civ. P. 8(a)(2)).

Assessment of the complaint must ordinarily be undertaken without resort to matters outside the pleadings; otherwise, the motion must be treated as one for summary judgment under Rule 56. *Wysocki v. Int'l Bus. Mach. Corp.*, 607 F.3d 1102, 1104 (6th Cir. 2010). "However, a

court may consider exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to defendant's motion to dismiss, so long as they are referred to in the complaint and are central to the claims contained therein, without converting the motion to one for summary judgment." *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016).

### III. Qualified Immunity

Qualified immunity shields public officials "'from undue interference with their duties and from potentially disabling threats of liability.'" *Guertin v. Michigan*, 912 F.3d 907, 916 (6th Cir. 2019) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982)). It "'gives government officials breathing room to make reasonable but mistaken judgments about open legal questions,' 'protect[ing] all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). As the plaintiff, Davis bears the burden of showing that Defendants are not entitled to qualified immunity. *See Bletz v. Gribble*, 641 F.3d 743, 750 (6th Cir. 2011). To do so, Davis must show "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *al-Kidd*, 563 U.S. at 735 (internal quotation marks omitted). "[C]ourts have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first." *al-Kidd*, 563 U.S. at 735.

> To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be settled law, which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority. It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. Otherwise, the rule is not one that every reasonable official would know.

*D.C. v. Wesby*, 138 S. Ct. 577, 589-90 (2018) (citations and quotation marks omitted). It is not necessary for there to be "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741. "Of course, there

4

can be the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Wesby*, 138 S. Ct. at 590.

> The "clearly established" standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him. The rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted. This requires a high degree of specificity. We have repeatedly stressed that courts must not define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced. A rule is too general if the unlawfulness of the officer's conduct does not follow immediately from the conclusion that the rule was firmly established.

*Wesby*, 138 S. Ct. at 590 (citations and quotation marks omitted). "Notice to officials is paramount; 'the salient question' in evaluating the clearly established prong is whether officials had 'fair warning' that their conduct was unconstitutional." *Guertin*, 912 F.3d at 932 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

Dismissing a case on the basis of qualified immunity at the motion-to-dismiss stage is "generally inappropriate." *Id.* at 917 (quoting *Wesley v. Campbell*, 779 F.3d 421, 433-34 (6th Cir. 2015)). As the Court of Appeals has explained:

> The assertion of qualified immunity at the motion-to-dismiss stage pulls a court in two, competing directions. On the one hand, the Supreme Court has repeatedly "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (internal quotation marks omitted). But on the other, "[w]hen qualified immunity is asserted at the pleading stage," as defendants did here, "the precise factual basis for the plaintiff's claim or claims may be hard to identify." *Id.* at 238-39 (citation omitted). We have thus cautioned that "it is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity. Although . . . entitlement to qualified immunity is a threshold question to be resolved at the earliest possible point, that point is usually summary judgment and not dismissal under Rule 12." *Wesley v. Campbell*, 779 F.3d 421, 433-34 (6th Cir. 2015) (internal citations, quotation marks, and brackets omitted). The reasoning for our general preference is straightforward: "Absent any factual development beyond the allegations in a complaint, a court cannot fairly tell whether a case is 'obvious' or 'squarely governed' by precedent, which prevents us from determining whether the facts of this case parallel a prior decision or not" for purposes of determining

5

whether a right is clearly established. *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 428 F.3d 223, 235 (6th Cir. 2005)[.]

*Id.*

### IV. Analysis

The first step in the qualified immunity analysis is identifying the constitutional right claimed by the plaintiff. Davis's constitutional claim is grounded in the due process protections of the Fourteenth Amendment, which provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "The Due Process Clause significantly restricts government action—its core is 'prevent[ing] government from abusing its power, or employing it as an instrument of oppression.'" *Guertin*, 912 F.3d at 917 (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 126 (1992)); *see also Lewis*, 523 U.S. at 845-46 ("The touchstone of due process is protection of the individual against arbitrary action of government, [including] the exercise of power without any reasonable justification in the service of a legitimate government objective." (internal quotation marks omitted)).

Due process has "procedural" and "substantive" components. *Id.* "Substantive due process 'bar[s] certain government actions regardless of the fairness of the procedures used to implement them.'" *Id.* at 918 (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)). "It 'specifically protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed.'" *Id.* (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997). Among those rights are the "right to bodily integrity" and "the right not to be subjected to arbitrary and capricious government action that 'shocks the conscience and violates the decencies of civilized conduct.'" *Id.* (quoting *Lewis*, 523 U.S. at 846-47).

Davis alleges in her complaint that she had a substantive due process right (1) to "have access to a restroom to urinate unless there existed a prison emergency," and (2) to "urinate in privacy." (Compl. ¶¶ 33-34, ECF No. 1.) In her brief, she describes the right as a right to use the restroom to relieve herself when (1) her body urgently needed to do so, (2) she informed prison officials of her need, and (3) there was no legitimate penological justification to delay and deny that access.

Davis's allegations implicate the following rights: bodily integrity, privacy, and the right not to be subjected to arbitrary and capricious governmental action. As to bodily integrity, the Court of Appeals for the Sixth Circuit recently stated that it is "an indispensable right recognized at common law" that encompasses "'freedom from bodily restraint and punishment.'" *Guertin*, 912 F.3d at 918 (quoting *Ingraham v. Wright*, 430 U.S. 651, 674 (1977)). In a concurring opinion, Judge McKeague argued that bodily integrity has traditionally been construed as a "'right against forcible intrusions of the body by the government.'" *Id.* at 956 (quoting *Planned Parenthood Sw. Ohio Region v. DeWine*, 696 F.3d 490, 506 (6th Cir. 2012)). There is no question, however, that freedom from bodily restraint and punishment is itself a "historic liberty interest" protected by due process. *Ingraham*, 430 U.S. at 673-74. Here, Plaintiff alleges that Defendants effectively restrained her and prevented her from leaving the visitation room to use the bathroom. And Turnley's words and actions indicate that they may have done so maliciously, i.e., as a kind of punishment.

Another fundamental right at stake is Davis's right to privacy. As the Supreme Court has stated,

> "There are few activities in our society more personal or private than the passing of urine. Most people describe it by euphemisms if they talk about it at all. It is a function traditionally performed without public observation; indeed, its performance in public is generally prohibited by law as well as social custom."

7

*Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 617 (1989) (quoting *Nat'l Treasury Employees Union v. Von Raab*, 816 F.2d 170, 175 (5th Cir. 1987)).  *Cf. West v. Dallas Police Dep't*, No. Civ. A. 3–95CV–1347P, 1997 WL 452727, at *5 (N.D. Tex. July 31, 1997) (finding a Fourteenth Amendment right "to urinate or defecate in reasonable privacy," and noting that "there are few activities that appear to be more at the heart of the liberty guaranteed by the Due Process Clause of the Fourteenth Amendment than the right to eliminate harmful wastes from one's body away from the observation of others").

The Court agrees with the decision in *Glaspy v. Malicoat*, 134 F. Supp. 2d 890 (W.D. Mich. 2001) that, for free citizens, the right to urinate in private, i.e. the right to urinate without soiling one's self in public view, is a fundamental one.  *Id.* at 895; *accord Thompson v. Spurgeon*, No. 3:13-CV-0526, 2013 WL 2467755, at *3 (M.D. Tenn. June 7, 2013).  In *Glaspy*, prison officials repeatedly denied a 69-year-old visitor's requests to use the bathroom even after he informed them that he needed to urinate urgently and that he was in pain.  *Id.* at 892.  Approximately 22-24 minutes after his first request, he soiled himself.  *Id.* at 893.  The court concluded that, because the visitor was not free to leave the prison visiting room and had no choice but to urinate on himself, the prison officials had deprived him of his "fundamental right to urinate." *Id.* at 895.  The same logic applies here.

Defendants characterize Davis's right as a "right to *immediate* access to a prison restroom *multiple times* during a visit." (Def.'s Br. 4, ECF No. 15.)  But that formulation is too narrow.  It does not fairly describe what Davis is claiming or what Defendants allegedly deprived her of.  Defendants allegedly kept Davis, a free citizen, confined in the prison visitation room for approximately 45 minutes after she repeatedly conveyed her desire to leave and her need for urgent access to the restroom.  And because of that delay, she involuntarily soiled herself in front of prison

8

officials. By the time she did so, Defendants had not only deprived her of some measure of liberty, but they had also deprived her of bodily privacy as well. Thus, the issue is not merely whether prison visitors have a right to access the bathroom on demand or at a certain frequency. Rather, the issue is whether they have a right to such access when needed to avoid the publicly humiliating circumstances suffered by Plaintiff. That right is not susceptible to rigid rules dictating the length of permissible delay in access to a bathroom or the frequency of access.

Defendants also argue that, even if there is a fundamental right to urinate in private, that right was not clearly established. But even if they are correct, Davis still has a possible means of overcoming qualified immunity and succeeding on her claim. Note that a violation of substantive due process occurs when the official is sufficiently at fault, i.e., when the official's abuse of power "shocks the conscience." *Lewis*, 523 U.S. at 847. That requirement permits different levels of culpability—from deliberate indifference to intentionally causing harm—depending on the particular circumstances. *Id.* at 850-52 ("Rules of due process are not . . . subject to mechanical application in unfamiliar territory. Deliberate indifference that shocks in one environment may not be so patently egregious in another[.]"). Courts look to "a multitude of considerations when evaluating an official's alleged arbitrariness in the constitutional sense, including the time for deliberation, the nature of the relationship between the government and the plaintiff, and whether a legitimate government purpose motivated the official's act." *Guertin*, 912 F.3d at 924. After considering these factors, the court in *Glaspy* determined that deliberate indifference was the appropriate standard of culpability for deprivation of the prison visitor's right to urinate. *Glaspy*, 134 F. Supp. 2d at 895.

Even in the absence of a clearly-established right to urinate in private, Davis had a broader, clearly-established right to freedom from "conduct deliberately intended to injure in some way

9

unjustifiable by any government interest." *See Lewis*, 523 U.S. at 834.  Davis's allegations plausibly suggest that one or more Defendants may have *intentionally* deprived Davis of the opportunity to use the restroom so that she would suffer, meeting a higher standard of culpability than deliberate indifference.  If that is what occurred, it is far more likely that any reasonable officer in Defendants' respective positions would have understood that their conduct was unlawful.

Suffice it to say that at this stage of the case, it is too early to frame the right at issue to discern whether it was clearly established.  Discovery is necessary to flesh out the facts further.  Accordingly, mindful that the dismissal stage is generally not the appropriate time to resolve questions about qualified immunity, the Court will deny Defendants' motion to dismiss.

An order will enter that is consistent with this Opinion.


Dated:   March 29, 2021                           /s/ Hala Y. Jarbou
                                                  HALA Y. JARBOU
                                                  UNITED STATES DISTRICT JUDGE